

Signed: March 31, 2005

**SO ORDERED**




NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**at Greenbelt**

| | | |
|---|---|---|
| In re | : | |
| | : | |
| PETER SHARP, | : | Case No. 02-21879 NVA |
| JOYCELYN SHARP, | : | Case No. 02-19020 NVA |
| | : | Chapter 7 |
| Debtors. | : | |
| | : | |
| . . . . . . | : | |
| | : | |
| COLUMBO BANK, FA | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| PETER SHARP, | : | Adv. Proc. No. 03-1098 NVA |
| JOYCELYN SHARP, | : | Adv. Proc. No. 02-1455 NVA |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION WITH REGARD TO COMPLAINT SEEKING DETERMINATION OF NONDISCHARGEABILITY UNDER § 523(A)(2)(B)**

This is an action seeking a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(B). It comprises two adversary proceedings which were procedurally consolidated by consent of the parties. The Court has jurisdiction of the action pursuant to 28 U.S.C. § 1334(b) and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This memorandum of decision constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

This action was commenced November 4, 2002 by complaint of Colombo Bank, FA (the "Bank") against Joycelyn Sharp ("Mrs. Sharp"), chapter 7 debtor (voluntary petition filed August 20, 2002). By answer filed December 11, 2002, Mrs. Sharp controverted most of the material allegations of the complaint. On October 28, 2002, Peter Sharp ("Mr. Sharp") (together with Mrs. Sharp, the "Sharps") also filed a voluntary chapter 7 petition. The Bank filed its complaint against Mr. Sharp on March 13, 2003. By answer filed June 3, 2003, he also controverted most of the material allegations of the complaint. Various pre-trial proceedings were conducted and discovery taken. The matter was heard for evidentiary trial on October 4, 2004. At trial, the Court heard testimony from Mr. Sharp, Mrs. Sharp and Hugh Rial, current President of the Bank; received into evidence various exhibits; had tendered by stipulation two deposition transcripts in lieu of testimony from Joel Fernebok, former Chairman of the Bank, and Thomas G. Knowles, former President of the Bank; and heard closing argument. The matter was then taken under advisement.

## GOVERNING LAW

The statutory basis for the Bank's nondischargeability complaints is 11 U.S.C. § 523(a)(2)(B), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
> (B) use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit rea-

sonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

Thus, to establish a claim under § 523(a)(2)(B), the Bank must show that the Sharps made a fraudulent written misrepresentation of their financial condition upon which the Bank reasonably relied in extending credit.[1] The Bank has the burden of proof in this proceeding by preponderance of the evidence. *Combs. v. Richardson* (*In re Combs*), 838 F.2d 112, 116 (4th Cir. 1988).

Thus, if a debtor applies for credit, deliberately fails to disclose a substantial portion of his or her pre-existing debt, and the creditor reasonably relies on that nondisclosure, the claim will be excepted from discharge. *In re Walthall*, 38 B.R. 140, 143 (Bankr. D. Md. 1984); *In re Vandergrift*, 35 B.R. 76, 77 (Bankr. D. Md. 1983); *In re Smith*, 25 B.R. 396, 398 (Bankr. D. Md. 1982). On the other hand, failure to establish one of the statutory elements will defeat the claim. *Citizens Bank of Maryland v. Broyles* (*In re Broyles*), 55 F.3d 980, 983 (4th Cir. 1995) (creditor did not rely on misrepresentation); *Engler v. Van Steinberg* (*In re Van Steinberg*), 744 F.2d 1060, 1061 (4th Cir. 1984) (misrepresentation not in writing); *In re Patch*, 24 B.R. 563, 567-68 (D. Md. 1982) (reliance not reasonable; duty to investigate representations); *In re Neal*, 35 B.R. 64, 66 (Bankr. D. Md. 1983) (no intent to deceive); *cf. In re Adams*, 311 B.R. 576, 587 (Bankr.

---

1. In its pre-trial statement filed September 9, 2004, the Bank impliedly requested (at p.5) that the Court permitted it to amend the complaints to add claims under § 523(a)(2)(A), relating in substance to credit obtained by actual fraud without regard, *inter alia*, to whether the fraud was perpetrated in writing. No motion under Bankruptcy Rule 7015 was filed, however, nor did the Bank at any time proffer the amended complaints it sought to file. Notably, actual fraud is a special matter which must be pleaded with particularity under Bankruptcy Rule 7009, so the absence of proposed amended pleadings was not a mere technical omission. Moreover, although not argued by the Bank, the reliance standard is somewhat different as between (A) and (B), see *Field v. Mans* (*In re Mans*), 516 U.S. 59, 70-72 (1995) (justifiable v. reasonable reliance). The parties prepared for trial and conducted discovery based only on the claim under subsection (B). At trial, the Court reserved ruling on the issue. In view of the lateness of the request, the absence of a motion accompanied by proposed pleadings, the prejudice to the defendants and the absence of substantial prejudice to the Bank, the request to amend is hereby denied.

M.D.N.C. 2004) (debts nondischargeable as against one debtor, but not as against spouse not active in loan negotiations and not shown to have been aware of misrepresentations); *In re Slonaker*, 269 B.R. 595, 601 (Bankr. N.D. Tex. 2001) (same).

## FINDINGS OF FACT

Based on the record and giving due regard to its opportunity to assess the credibility of the witnesses, the Court finds as follows. To the extent there was a conflict in the evidence, the Court resolves such conflicts consistent with these findings.

1. On September 25, 1995, the Bank made a loan to the Sharps in the amount of $500,000 (the "Loan"). As security, the Bank received a mortgage which it believed was a second priority lien on the Sharps' residence in Bethesda, Maryland (the "Maryland Property") and a second priority lien on a vacation property located on Kiwah Island, South Carolina (the "South Carolina Property").

2. The Bank understood and believed that its lien on the Maryland Property was second only to a first priority mortgage in favor of Chase Bank of Maryland ("Chase") in the principal amount of $750,000. Moreover, it is undisputed that the Bank understood its lien on the South Carolina Property was second to a first priority mortgage in favor of Prudential Home Mortgage Company, Inc. ("Prudential") in the principal amount of $347,000.

3. Contrary to the Bank's expectation and belief, its mortgage on the Maryland Property was in fact in third position, behind a prior-recorded second mortgage to secure a home equity line of credit in the maximum principal amount of $75,000 (the "Signet Loan"). The Signet mortgage was senior in priority to the Bank's mortgage because the former was recorded on March 6, 1995.

4. In connection with the loan negotiations, the Bank came into possession of a financial disclosure (Plaintiff's Exhibit #3), consisting of two pages on a Bank of Maryland form, purporting to describe Mr. Sharp's assets and liabilities as of December 12, 1994. The principal assets listed were ownership of First Charter Title Corporation ("First Charter") (valued at $3 million), the Maryland Property (valued at $1.3 million) and the South Carolina Property (valued at $525,000). The principal liabilities disclosed were the first mortgages on each of the Maryland and South Carolina properties (in the principal amounts of $748,000 and $367,000, respectively). The Signet Loan, which had not yet been made in December 1994, was not disclosed.

5. Mr. Sharp testified that he has no recollection of giving this financial disclosure to the Bank; indeed, that he has no recollection of ever having filled out the form. Mr. Sharp acknowledged, however, that the handwriting appears to be his and that the disclosure was a substantially accurate account of his financial position in December 1994. Mr. Fernebok's deposition testimony was that he recalled Mr. Sharp giving him the financial disclosure and Mr. Sharp could offer no other explanation for how it came into the Bank's possession. The Court finds that Mr. Sharp gave the financial disclosure to the Bank.

6. It is undisputed that the disclosure did not mention the Signet Loan which, as mentioned, had not yet been made. The question is whether presentation of a December 1994 disclosure in March or April 1995,[2] after the Signet Loan had been made, was a fraudulent misrepresentation. Mr. Sharp testified (i) he believed the Signet mortgage had not been recorded because the line of credit had not yet been drawn and (ii) he

2. None of the witnesses could recall precisely when Peter Sharp approached the Bank seeking a loan. Mr. Fernebok testified, however, that it probably was April 1995, as the Bank would not have commissioned an appraisal (Plaintiff's Exhibit #6) unless there was a loan application under consideration.

verbally disclosed the Signet line of credit and his understanding that it was not yet recorded to Mr. Fernebok. In his deposition, Mr. Fernebok denies that Mr. Sharp made any such disclosure. Unfortunately, no evidence was submitted by either side with respect to Signet's loan practices at the time, which probably would have resolved the issue. The Court is required, then, to rely on its assessment of Mr. Sharp's testimony. After careful consideration, the Court finds that his testimony was not credible.

7. Also undisputed is that, in connection with the Loan closing, Mr. Sharp's company, First Charter, supplied to the Bank a title insurance commitment dated September 11, 1995 (Plaintiff's Exhibit #9), to which was attached a title abstract with respect to the Maryland Property. Further, it is undisputed that this title abstract did not reflect the Signet mortgage, which had been recorded in March 1995. Mr. Sharp explained that this happened because the title abstract had been prepared in January, at which time the Signet mortgage had not yet been recorded. The Court cannot and does not believe that a professional title insurance agent – and this was, after all, Mr. Sharp's main business at the time – would issue a title insurance commitment in September based on title work performed in January unless, as the Bank contends, it was a deliberate act of nondisclosure. This is clinching proof that Mr. Sharp misled the Bank and that he *deliberately* furnished a stale financial disclosure and a stale title abstract which he knew did not reflect the Signet Loan and mortgage.

8. Although the Court finds that Mr. Sharp deliberately misled the Bank as to the Signet Loan, no evidence – literally *no* evidence – suggests that Mrs. Sharp participated in, or was even aware of the substance of the pre-closing discussions, representations and negotiations. Indeed, the only connection she had with the misrepresentation

was that, after the closing, she executed (together with Mr. Sharp) an affidavit certifying to the Bank that the December 1994 financial disclosure was a full and fair description of the Sharps' financial condition as of the closing. Her testimony, corroborated by Mr. Sharp, was that she signed this affidavit as an accommodation, because Mr. Sharp said she should. Plainly the affidavit was misleading, but the Court finds that Mrs. Sharp did not know this and had no intent to deceive. In any event, the Bank obviously did not rely on the affidavit to its detriment, as the Loan had already been funded.[3]

9. Moreover, the Bank failed to establish that Mr. Sharp's pre-funding nondisclosure of the Signet Loan was material.[4] Rather, as evidenced by the credit memorandum (Plaintiff's Exhibit #2), it appears Mr. Fernebok was "hot" to make this loan because he hoped to develop a banking relationship with Mr. Sharp whereby First Charter would channel escrow closing funds through the Bank. Moreover, the primary credit underwriting criterion for approving the loan, as reflected in Mr. Fernebok's deposition, was Mr. Sharp's valuation of First Charter at $3 million. It does not appear of re-

---

3. Although the argument was not clearly developed, the Bank suggested that the post-funding misrepresentations, and there was at least one more (Plaintiff's Exhibit #17), are grounds for denial of dischargeability under § 523(a)(2), which speaks not only to making loans but renewals, extensions and forbearance. The Bank never identified, however, any way in which it changed its position in reliance on the misrepresentations. Rather, as reflected in a credit memorandum prepared in contemplation of one of the loan extensions (Plaintiff's Exhibit #19), the primary if not exclusive focus of the Bank was on identifying sources of repayment for a Loan which already had been made. Compare *In re Plechaty*, 213 B.R. 119, 126 (6th Cir. B.A.P. 1997) (forbearance reliance shown), with *In re McBee*, 167 B.R. 827, 831 (Bankr. E.D. Va. 1994) (reliance in forbearance context not demonstrated).

4. The Bank's theory of the case was, in effect, that since it does not and did not make third priority mortgage loans, failure to disclose the Signet mortgage was *ipso facto* material. The issue is a little more subtle than that. *Cf. In re Grant*, 237 B.R. 97, 116 (Bankr. M.D.N.C. ) (rejecting a similar "but for" materiality argument). In ordinary legal usage, materiality goes to the importance of the misrepresented or undisclosed fact in the context of the overall decision to make the loan. *Cf. Jordan v. Southeast Nat'l Bank* (*In re Jordan*), 927 F.2d 221, 224 (5th Cir. 1991) ("A materially false statement is one that 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'") (citations omitted), overruled on another point (standard of review regarding reasonability of reliance), *Coston v. Bank of Malvern* (*In re Coston*), 991 F.2d 257, 261 (5th Cir. 1993) (en banc), holding on materiality standard quoted here reaffirmed, *Norris v. First Nat'l Bank of Luling* (*In re Norris*), 70 F.3d 27, 30 n.10 (5th Cir. 1995).

cord that Mr. Fernebok made any effort to verify that valuation, which in hindsight proved to be greatly overstated. The second credit underwriting criterion was Mr. Sharp's expectation of $370,000 in commissions for brokering two loan transactions, which were the principal anticipated source of repayment of the Loan (hence its having only a one year term). It does not appear of record that Mr. Fernebok made any effort to "due diligence" those commissions, which apparently failed to materialize. The security furnished by the mortgages was thus only the third credit underwriting criterion and the Bank's analysis was that there was a combined $800,000 equity cushion in the Maryland and South Carolina Properties.[5] In other words, the Bank's loss was caused by the parties' shared mistaken evaluations of Mr. Sharp's ability to repay the loan from income and/or the value of his business and the value of the properties pledged as collateral. In this context, the Bank has not demonstrated that an undisclosed $75,000 second mortgage, sandwiched between a $750,000 first and a $500,000 third, was material.[6]

10. Finally, the Court cannot find that the Bank reasonably relied on Mr. Sharp's misrepresentation. The uncontroverted testimony was that the Bank made no independent investigation of the Sharps' title. The primary purpose of a title report is to *verify* the borrower's representations as to the state of title. In the Court's view, a lender relies on a title report supplied by the borrower at its peril.

---

5. As mentioned in n.2, the Bank commissioned an appraisal of the Maryland Property in April 1995 (Bank's Exhibit #6). The appraisal indicated a value of $1,125,000, but Mr. Fernebok believed the Maryland Property to be worth $200,000 more. See credit memorandum (Bank's Exhibit #2). Similarly, one of the Bank's directors apparently was familiar with the South Carolina Property and believed it to be worth about $600,000, i.e., $75,000 more than Mr. Sharp had claimed in the financial disclosure. *Id.*

6. Indeed, Signet's mortgage was irrelevant to the Bank's loss on the Loan, for both the Signet mortgage and the Bank's position (it had by then acquired title by foreclosure) were extinguished by Chase's foreclosure of the first mortgage. The details were not submitted of record, but the Bank's mortgage on the South Carolina Property apparently suffered the same fate when Prudential foreclosed its first mortgage.

## CONCLUSIONS OF LAW

Based on the foregoing and the case law summarized in the Governing Law section of this memorandum, the Court concludes that: (i) the Bank has demonstrated no basis for nondischargeability of the Loan as regards to Mrs. Sharp; (ii) Mr. Sharp deliberately and fraudulently made two false written misrepresentations-by-omission with respect to the existence of the Signet Loan; (iii) the Bank has not demonstrated that, in the context of the overall loan transaction, Mr. Sharp's misrepresentations were material to its decision to make the Loan; and (iv) any such reliance was not reasonable, as the Bank failed to obtain a title report from a disinterested third party.

cc: The Debtors
William G. Simmons, Esq.
Stephen W. Nichols, Esq.
Roger Schlossberg, Esq.

**End of Decision**