

NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| PETER SHARP and | * | Case Nos. 02-21829 NVA |
| | | 02-19020 NVA |
| JOCELYN SHARP | * | |
|     Debtors. | * | (Chapter 7) |
| * * * * * * * * | | |
| COLUMBO BANK, FSB | * | |
|     Plaintiff, | * | Adv. Pro. No. 03-1098 |
| v. | | |
| | * | |
| PETER SHARP | | |
| | * | |
|     Defendant. | | |
| * * * * * * * * * * * * * | | |

**MEMORANDUM OF DECISION AND ORDER WITH REGARD TO COMPLAINT
SEEKING DETERMINATION OF NONDISCHARGEABILITY UNDER § 523(a)(2)(A)**

On September 12, 2005, this Court granted reconsideration [71] of its prior Memorandum of Decision [61] with Regard to Complaint Seeking Determination of Nondischargeability under §523(A)(2)(B). In granting reconsideration, the sole issue for determination is whether Columbo Bank, the plaintiff herein (the "Bank" or the "Plaintiff") proved a cause of action under

§523(a)(2)(A) against Peter Sharp, the defendant herein ("Mr. Sharp" or the "Defendant") during an evidentiary trial conducted on October 4, 2004. This is the sole issue addressed herein.[1] The Court's prior finding, that Columbo Bank failed to make a showing under §523(a)(2)(B) is not under reconsideration and remains undisturbed.[2]

In connection with this count against Mr. Sharp, the Bank argues that Mr. Sharp's failure to inform the Bank of a pre-existing second mortgage lien in the amount of $75,000 on his home in favor of Signet Bank is sufficient to render the debt owing from Mr. Sharp to the Bank that is secured by his home (as well as other property) nondischargeable.

Because the Court has already held a full evidentiary hearing and rendered a written opinion with respect to § 523 (a) (2) (B), the Court need not re-address the record for the purpose of finding

---

[1] At trial, the parties failed to argue, and the Court did not address, the evidence as applied to § 523 (a)(2)(A). In fact, in its first post-trial submission, the Bank requested that it be permitted to amend its complaint to add a count under this section. After review, it appears that the Bank did include a count under this section in its complaint against Mr. Sharp, but did not include a count under this section in its complaint against Mrs. Sharp. Accordingly, the Court has granted reconsideration of its order entered April 1, 2005 for the limited purpose of analyzing the facts as presented at trial to a cause of action under § 523 (a)(2)(A) as against Mr. Sharp only.

[2] 11 U.S.C. § 523 (a)(2)(B) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> > (B) use of a statement in writing--
> > > (i) that is materially false;
> > > (ii) respecting the debtor's or an insider's financial condition;
> > > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > > (iv) that the debtor caused to be made or published with intent to deceive.

2

the same facts. Instead, based on this Court's prior findings of fact in conjunction with its April 1, 2005 Opinion ("*Sharp I*"), the Court has already found several facts that are germane to a determination of the issues presented herein.[3] The Court sets forth the relevant facts herein as follows:[4]

> 1. On September 25, 1995, the Bank made a loan to the Sharps in the amount of $500,000 (the "Loan"). As security, the Bank received a mortgage which the Bank believed was a second priority lien on the Sharps' residence in Bethesda, Maryland (the "Maryland Property") and a second priority lien on a vacation property located in South Carolina (the "South Carolina Property").
>
> 2. The Bank understood and believed that its lien on the Maryland Property was second only to a first priority mortgage in favor of Chase Bank of Maryland ("Chase") in the principal amount of $750,000. Moreover, it is undisputed that the Bank understood its lien on the South Carolina Property was second to a first priority mortgage in favor of Prudential Home Mortgage Company, Inc. ("Prudential") in the principal amount of $347,000.
>
> 3. Contrary to the Bank's expectation and belief, its mortgage on the Maryland Property was in fact in third position, behind a prior-recorded second mortgage to secure a home equity line of credit in the maximum principal amount of $75,000 (the "Signet Loan"). The Signet mortgage was senior in priority to the Bank's mortgage because the former was recorded on March 6, 1995.

---

[3] The Bank does not seek reconsideration of the Court's prior findings and concedes that determination of the § 523(a)(2)(A) issue can be made on the existing record. *See* transcript of hearing on motion to reconsider conducted on August 31, 2005 at 25.

[4] The Court notes that several of the findings of fact have been edited for brevity from the *Sharp I* opinion. Only those factual findings that the Court has determined are germane to its reasoning and holding here are set forth.

4. In connection with the loan negotiations, the Bank came into possession of a financial disclosure purporting to describe Mr. Sharp's assets and liabilities as of December 12, 1994. The principal assets listed were ownership of First Charter Title Corporation ("First Charter") (valued at $3 million), the Maryland Property (valued at $1.3 million) and the South Carolina Property (valued at $525,000). The principal liabilities disclosed were the first mortgages on each of the Maryland and South Carolina properties (in the principal amounts of $748,000 and $367,000, respectively). The Signet Loan, which had not yet been made in December 1994, was not disclosed.

5. Despite his testimony that he had no recollection of this form, the Court found that Mr. Sharp gave the financial disclosure to the Bank.

6. The Court found that Mr. Sharp did not verbally disclose the existence of the Signet Loan to the Bank.

7. Mr. Sharp misled the Bank by *deliberately* furnishing a stale financial disclosure and a stale title abstract which he knew did not reflect the Signet Loan and mortgage in connection with the Loan application and the Loan closing.

8. The Bank failed to establish that Mr. Sharp's pre-funding nondisclosure of the Signet Loan was material. Rather, as evidenced by the credit memorandum (Plaintiff's Exhibit #2), it appears Mr. Fernebok [the chairman of the bank at that time] was "hot" to make this loan because he hoped to develop a banking relationship with Mr. Sharp whereby First Charter would channel escrow closing funds through the Bank. Moreover, the primary credit underwriting criterion for approving the loan, as reflected in Mr. Fernebok's deposition, was Mr. Sharp's valuation of First Charter at $3 million. It does not appear of record that Mr. Fernebok made any

effort to verify that valuation, which in hindsight proved to be greatly overstated. The second credit underwriting criterion was Mr. Sharp's expectation of $370,000 in commissions for brokering two loan transactions, which were the principal anticipated source of repayment of the Loan (hence its having only a one year term). It does not appear of record that Mr. Fernebok made any effort to "due diligence" those commissions, which apparently failed to materialize. The security furnished by the mortgages was thus only the third credit underwriting criterion and the Bank's analysis was that there was a combined $800,000 equity cushion in the Maryland and South Carolina Properties. In other words, the Bank's loss was caused by the parties' shared mistaken evaluations of Mr. Sharp's ability to repay the loan from income and/or the value of his business and the value of the properties pledged as collateral. In this context, the Bank has not demonstrated that an undisclosed $75,000 second mortgage, sandwiched between a $750,000 first and a $500,000 third, was material.

      9.      Signet's mortgage was irrelevant to the Bank's loss on the Loan, for both the Signet mortgage and the Bank's position (it had by then acquired title by foreclosure) were extinguished by Chase's foreclosure of the first mortgage. The details were not submitted of record, but the Bank's mortgage on the South Carolina Property apparently suffered the same fate when Prudential foreclosed its first mortgage.

      10.      The Bank did not reasonably rely on Mr. Sharp's misrepresentation. The uncontroverted testimony was that the Bank made no independent investigation of the Sharps' title. The primary purpose of a title report is to *verify* the borrower's representations as to the state of title. In the Court's view, a lender relies on a title report supplied by the borrower at its peril.

*Sharp I*, 4-8.

Section 523 (a)(2)(A) of the Bankruptcy Code is the specific basis upon which the Bank relies to except Mr. Sharp's liability on the Loan from discharge based on Mr. Sharp's representations to the Bank. This section provides as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523 (a)(2)(A).

Exceptions to discharge are narrowly construed in order to further the Bankruptcy Code's policy of providing a fresh start to debtors; thus, the claimant has the burden to demonstrate that the claim comes within an exception to discharge by a preponderance of the evidence. *In re White*, 128 Fed.Appx. 994, 998, 2005 WL 984195, *3 (4th Cir. 2005), *citing Grogan v. Garner,* 498 U.S. 279, 286 (1991).[5]

The Fourth Circuit has recently addressed the §523(a)(2)(A) dischargeability exception (a section the court acknowledges it has had infrequent occasion to consider) and explained that in order to establish the non-dischargeability of a debt pursuant to this section, the creditor must

---

[5] *Grogan v. Garner* settled a split in the circuits as to the burden of proof that the moving creditor was required to sustain. Prior to *Grogan*, many courts reasoned that §523 (a)(2)(A) required proof of each element by clear and convincing evidence because the section has fraud as its underpinnings. *Grogan* clarifies that this section requires proof by the lesser preponderance of the evidence standard.

establish all five elements of fraud as follows: (i) a false representation by the debtor, (ii) knowledge that the representation was false, (iii) intent to deceive, (iv) justifiable reliance by the creditor on the representation, and (v) a showing that the representation was the proximate cause of damages. *In re Rountree,* 478 F.3d 215, 218 (4th Cir. 2007).

      The *Rountree* court also emphasized the importance of ensuring that each element of §523(a)(2)(A) is proved by a preponderance of the evidence. In *Rountree*, it was undisputed that the debtor had engaged in fraud as against the creditor and that the fraud resulted in a debt owing from the debtor to the creditor.[6] *Rountree* at 222. The Fourth Circuit determined that merely having engaged in fraud was not sufficient to prove the § 523(a)(2)(A) dischargeability exception; the debt also must fit within the mandate of the statute. *Id.* at 224. In *Rountree*, the plaintiff failed to prove that the debt was "obtained by" fraud. *Id.*

      *Rountree* makes it clear that deceit, standing alone, is not sufficient. Each element of the "fraud exception" must be proven in order for the exception to apply. "Since all of the elements must be sustained, a bankrupt may give a materially false financial statement in writing, know it is false and inten[ded] out-and-out to deceive, yet if the creditor did not rely upon the statement, the debt is still discharged." *In re Smith*, 2 B.R. 276, 279 (E.D. Va. 1980) (internal citation omitted).

      Based on the foregoing findings of fact and each of the elements required for a showing under §523(a)(2)(A), the Court finds that the Bank has conclusively established three of the five elements required for a finding of nondischargeability under this section. Specifically, the Court finds that the Bank has established that: (i) Sharp made a false representation to the Bank when he

---

[6] "Rountree's activity here was nothing if not deceitful..." *Rountree, supra* at 222. (Wilkinson, J.) (concurring).

7

gave the Bank a financial statement that omitted the Signet mortgage and led the Bank to believe that the Bank would be acquiring a second mortgage position on the Maryland property in connection with the Loan, (ii) Sharp had knowledge that his representation was false and (iii) Sharp made this representation with an intent to deceive the Bank. Thus, the only factors that are at issue are (i) whether the Bank justifiably relied on Sharp's misrepresentation and (ii) whether the misrepresentation was the proximate cause of the Bank's damages.

As set forth below, the Court finds that the Bank did not justifiably rely on Sharp's misrepresentation for the purposes of § 523(a)(2)(A) and the Court also finds that Sharp's misrepresentation was not the proximate cause of the Bank's damages.

1. Justifiable Reliance

"Justifiable reliance" is a flexible and subjective standard that "requires more than actual reliance but less than reasonable reliance." *In re White* 128 Fed.Appx. 994, 999, 2005 WL 984195, *4 (4th Cir. 2005) (internal citation omitted).[7] The Supreme Court teaches that justifiable reliance, as distinct from reasonable reliance, "is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans,* 516 U.S. 59, 71 (1995) (*citing* Restatement (Second) of Torts (1976). Generally, the justifiable reliance standard does not impose a duty to investigate unless there are circumstances indicating that an investigation is appropriate and reliance is unwarranted. *Fields* at 70-72. *See also*, *In re Biondo,* 180 F.3d 126, 135 (4th Cir. 1999) (adopting a "minimal standard" for justifiable reliance in case in which there were no red flags).

---

[7] The Court has already found that the Bank's reliance on the title report prepared by an entity controlled by Mr. Sharp was not *reasonable* for the purposes of § 523 (a)(2)(B). Whether the Bank's reliance was *justifiable* under § 523 (a)(2)(A) is a lesser standard. *See Field v. Mans,* 516 U.S. 59 (1995).

Whether reliance is justified in a particular instance also takes into account the relationship of the parties. *White, supra*. For example, when the parties have a past course of dealings that is marked by trust and confidence, the history between the parties may make it justifiable to rely on a party's representation. *See Sanford Institution for Sav. v. Gallo* 156 F.3d 71, 76 (1st Cir. 1998) (Lender was not required to perform due diligence or a title search with respect to debtor's mortgage application in order for reliance to be reasonable; court found that "[p]rior to this incident, [the debtor] was reputed to be an honest, trustworthy, and reliable businessman in the community and was a long-time [] customer [of the lender] who always paid off his previous loans.... He had a strong business and somewhat personal relationship with [the bank president]...Certainly, the representations of a long-time customer with a reputation for honesty and trustworthiness and an excellent track record of consistent loan repayments was a basis on which to justify reliance.")

Where, however, the lender is sophisticated, the sums involved are significant, there is no history upon which the lender can rely and the only information that the lender has comes from the borrower, the lender cannot later be heard to complain that it was duped. *See, e.g., In re Merrick,* 347 B.R. 182, 187-188 (Bankr.M.D. La. 2006) (commenting that the lender, which was "in the business of making mortgage loans" and "easily could have inspected the state court succession record," and yet put its "reliance solely on the debtor's representations concerning her ownership of the property to be mortgaged, without verifying her ownership of the property, is astounding.")

In the instant case, the Court has already found that it was not reasonable for the Bank to rely on a stale title report prepared by the Debtor's own title company and a stale financial statement without doing its own due diligence. The pertinent inquiry however is the extent to which the Bank was justified in relying on these representations, or whether the facts and circumstances of the case,

9

including the sophistication of the Bank, should have put the Bank on notice that an investigation was appropriate and that reliance was unwarranted. In this Court's view, there are several factors that should have put the Bank on notice. First and foremost, the fact that the Debtor produced a stale title report prepared by a company under his control should have been a red flag to the Bank that something was amiss. The Bank, had it looked at the Loan and the surrounding circumstances objectively, may have realized that the fact that it was "hot" to do this deal with the Debtor in the hopes of garnering future business from him was also a red flag in the manner that it detrimentally affected its collective judgment. The Bank had no history with the Debtor and no past relationship of trust and confidence upon which it could rely. Instead of being prudent, the Bank appears to have been more focused on possible future returns and seemingly ignored the fact that, by the time the Loan closed, the financial disclosure was nine months old and the title report was eight months old. Given the lack of history between these parties, the irregularity of these documents and the sophistication of the plaintiff, the Court does not find that the Bank's reliance on the Debtor's representations was justified.

        2.        <u>Proximate Cause</u>

The Supreme Court made clear in *Fields, supra,* that just because § 523(a)(2)(A) requires "justifiable" reliance instead of "reasonable" reliance, that the reasonableness of the lender's reliance is still a relevant inquiry to a § 523 (a)(2)(A) analysis. The *Fields* court explained that "the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact....[t]he subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance." *Fields* at *76*. This has bearing on the final factor in the § 523 (a)(2)(A) analysis, which is the proximity of the reliance to the damages.

Because the Court has already found that the Bank's reliance was not reasonable, the Court also does not believe that the Bank has established reliance in fact necessary for a showing that the misrepresentation was a proximate cause of the damages suffered by the Bank. Based on the evidence at the trial and the record in this case, the Court has already found that the primary credit underwriting criterion was the value of Mr. Sharp's business, followed by the value of the commissions he was expecting; the omission of a single $75,000 mortgage when compared to a business that was valued at $3,000,000 and expected commissions in the amount of $370,000 is not determinative. Moreover, if the amount of the equity in each of the properties were material to the Bank, it would have conducted a title report and would not have relied on a report that was eight months old and prepared by a company controlled by the Debtor. Thus, the Court does not find that the additional $75,000 of equity that the Bank thought was in the Maryland Property was a material inducement to make the Bank enter into the Loan. See *In re Biondo,* 180 F.3d 126, 135 (4th Cir. 1999) (finding that causation exists when the fraudulent representation induces the financing).

In addition, this Court found in *Sharp I*, Signet's mortgage was irrelevant to the Bank's loss on the Loan, because both the Signet mortgage and the Bank's position (it had by then acquired title by foreclosure) were extinguished by the foreclosure of the first mortgage. Thus, the Bank has also failed to establish that the omission of the Loan was the proximate cause of its damages.

Because Columbo Bank has failed to prove its case under § 523 (a)(2)(A), the Court will enter judgment in favor of the Debtor. Accordingly, in consideration of the foregoing, it is, by the United States Bankruptcy Court for the District of Maryland, hereby:

ORDERED that judgment is hereby entered in favor of the Debtor, Peter Sharp.

cc:

    Peter Sharp, Debtor
    William G. Simmons, Esq.
    Stephen W. Nichols, Esq.
    Roger Schlossberg, Esq.

**END OF ORDER**