```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
```

COLOMBO BANK, F.S.B.,           :

    Appellant               :

                                :

    v.                      : Civil Action No. DKC 2007-2935

                                :

PETER A. SHARP, ET AL.,         :

    Appellees               :

                                :

**MEMORANDUM OPINION**

Presently pending and ready for resolution is the appeal of Colombo Bank, F.S.B. from the Orders of United States Bankruptcy Judge Nancy V. Alquist denying Colombo Bank's objection to discharge, (bankr. papers 61, 82). Oral argument is deemed unnecessary because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See* Fed.R.Bankr.P. 8012. For the reasons that follow, the court will affirm the orders of the bankruptcy court.

**I.  Background**

This appeal arises from a consolidated adversary proceeding in which the bankruptcy court granted Peter and Joycelyn Sharp a discharge of the debt they owed to Colombo Bank, F.S.B. ("the Bank"). The Sharps defaulted on a loan from the Bank and subsequently filed for Chapter 7 bankruptcy, under which their debt

to the Bank would be discharged. In the proceeding below, the Bank sought a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B).[1] The bankruptcy court rejected the Bank's arguments and found that no exceptions to discharge applied. The undisputed facts found by the bankruptcy court are as follows.

Mr. Sharp is the founding member, president and sole shareholder of First Charter Title Corporation. In either March or April 1995, Mr. Sharp approached the Bank for a $500,000 loan to fund an amount owing from a settlement agreement reached with a client of First Charter. On September 25, 1995, the parties closed on a $500,000 loan to be repaid within one year. As security for the loan, the Bank received a mortgage which it believed was a second priority lien on the Sharps' Bethesda residence and a second priority lien on the Sharps' South Carolina vacation home. The Bank did not know that its mortgage was in fact in third position behind the first mortgages and an undisclosed second mortgage from

---

[1] The Bank sought relief under both 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B) in its complaint, but failed to argue its § 523(a)(2)(A) claims at the hearing in September 2004. As a result, the bankruptcy court entered judgment in favor of the Sharps on § 523(a)(2)(B) only, and did not address the § 523(a)(2)(A) claim. (Bankr. Paper 61). After realizing its mistake, the Bank filed a motion to reconsider with regard to the § 523(a)(2)(A) claim. The bankruptcy court granted the motion, but did not make additional findings of fact. On September 28, 2007, the court entered judgment in favor of the Sharps on § 523(a)(2)(A). (Bankr. Paper 82).

Signet Bank to secure a home equity line of credit in the amount of $75,000 ("the Signet loan").

At some point prior to closing, as part of the loan negotiations, Mr. Sharp presented the Bank with a financial disclosure statement dated December 12, 1994, which purported to describe Mr. Sharp's assets and liabilities. (Pl.'s Hr'g Ex. 3). The principal assets listed were the ownership of First Charter (valued at $3 million), the Sharps' residence in Bethesda, Maryland (valued at $1.3 million), and the Sharps' vacation residence in South Carolina (valued at $525,000). The principal liabilities listed were the first mortgages on each of the Maryland and South Carolina properties (for $748,000 and $367,000, respectively).[2] The financial statement did not list the Signet loan, even though it had been recorded on March 6, 1995. The bankruptcy court found that Mr. Sharp's presentment of the December 1994 disclosure after the Signet loan had been made was a fraudulent misrepresentation.

Also in connection with the loan negotiations, Mr. Sharp provided a commitment for title insurance from American Pioneer, to which was attached a title abstract of the Bethesda property prepared by First Charter. (Pl.'s Hr'g Ex. 9). Although the title abstract had an effective date of September 11, 1995, it did not

---

[2] The Sharps defaulted on the first priority mortgage after they defaulted on the loan from the Bank. The foreclosure sale yielded proceeds to pay the first priority lender's encumbrance, but not the debt owed to the Bank.

3

reflect the Signet loan. At the hearing below, Mr. Sharp attempted to explain the deficiency by stating that the abstract had been prepared in January 1995. The bankruptcy court did not believe that a professional title company would issue a title commitment based on eight month-old title work. The court found that Mr. Sharp "misled the Bank and that he *deliberately* furnished a stale financial disclosure and a stale title abstract which he knew did not reflect the Signet Loan and mortgage." (Bankr. Paper 61, at 6) (emphasis in original).

Although the bankruptcy court found that Mr. Sharp made a fraudulent misrepresentation to the Bank, it found that the Bank had not established the other elements necessary to require an exception to discharge under either 11 U.S.C. § 523(a)(2)(A) or § 523(a)(2)(B). The court found that Mrs. Sharp did not know of the misrepresentations and had no intent to deceive. The Bank does not appeal the court's findings regarding Mrs. Sharp.

The Bank presents the following four issues on appeal: regarding 11 U.S.C. § 523(a)(2)(A), did the bankruptcy court err in finding that the Bank did not justifiably rely on Mr. Sharp's fraudulent concealment of the Signet loan? and did the court err in concluding that the fraudulent concealment of the Signet loan was not the proximate cause of its loss? Regarding 11 U.S.C. § 523(a)(2)(B), did the court err in finding that the fraudulent financial statement was immaterial to the Bank's loss? and did the

4

court err in finding that the Bank's reliance on Mr. Sharp's fraudulent financial statement was not reasonable?

## II. Standard of Review

On appeal from the bankruptcy court, the district court acts as an appellate court and reviews the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. *See In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992); *In re Bryson Props., XVIII*, 961 F.2d 496, 499 (4th Cir. 1992). For findings of fact, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed.R.Bankr.P. 8013. Under the clearly erroneous standard, a reviewing court will not reverse "simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *Citizens Bank of Md. v. Broyles (Matter of Broyles)*, 55 F.3d 980, 983 (4th Cir. 1995). A finding of fact is clearly erroneous only when the reviewing court "is left with a definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

## III. Analysis

5

In general, "[w]hen considering the applicability of an exception to discharge, we construe the exception narrowly 'to protect the purpose of providing debtors a fresh start.'" *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007) (citing *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)). The burden of proof is on the creditor to establish by a preponderance of the evidence that its debt is entitled to nondischargeability under § 523(a). *Kubota Tractor Corp. v. Strack (In re Strack)*, -- F.3d --, No. 07-1200, 2008 WL 681809, at *3 (4th Cir. March 11, 2008, released for publication May 1, 2008); *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Rountree*, 478 F.3d at 220.

**A. Nondischargeability for false pretenses, fraud, or false misrepresentation: 11 U.S.C. § 523(a)(2)(A)**

Title 11 U.S.C. § 523(a)(2)(A) disallows a discharge "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" In *Field v. Mans*, 516 U.S. 59, 71 n.9 (1995), the Supreme Court of the United States established that § 523(a)(2)(A) incorporated the "general common law of torts." The common law elements of fraudulent misrepresentation include (1) a representation; (2) that the debtor knew was false; (3) that he made with the intention of deceiving the creditor; (4) that the creditor justifiably relied on; and (5)

6

that the creditor sustained the alleged loss and damage as the proximate result of the false representation. *See In re Rountree*, 478 F.3d at 218. In the proceeding below, the Bank argued that Mr. Sharp's submission of a false title report was a fraudulent misrepresentation that precluded discharge under § 523(a)(2)(A). The bankruptcy court found, and the Bank does not challenge on appeal, that Mr. Sharp's omission of the Signet mortgage from the title report was a fraudulent misrepresentation. The Bank contests the bankruptcy court's findings that the Bank was not justified in relying on Mr. Sharp's false misrepresentation and that the misrepresentation was not the proximate cause of the Bank's loss. The conclusions regarding justifiable reliance and proximate cause are findings of fact. *Giovanni v. Grayson, Kubli & Hoffman, P.C. (In re Giovanni)*, 324 B.R. 586, 593 (E.D.Va. 2005).

    **1.   Justifiable Reliance**

Justifiable reliance is an intermediate standard requiring more than mere reliance but less than reasonable reliance. *Field*, 516 U.S. at 72-75. The Supreme Court explained that the inquiry is a subjective one, as "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71 (quoting RESTATEMENT (SECOND) OF TORTS § 545A, cmt. b). The standard of justifiable reliance imposes no duty upon the recipient

of the representation to investigate, unless there are circumstances that should arouse suspicion. The Supreme Court explained that an individual is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field*, 516 U.S. at 71 (quoting RESTATEMENT (SECOND) OF TORTS § 541 cmt. a (1976)). Thus, "only the disregard of 'red flags' falls below the justifiable-reliance standard." *In re Giovanni*, 324 B.R. at 594; *see also* W. PROSSER, LAW OF TORTS § 108, at 718 (4th ed. 1971) ("It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.").

Based on these principles, the bankruptcy court concluded that the Bank did not justifiably rely on the title abstract prepared by First Charter. The bankruptcy court identified several factors to support its finding. First, the fact that the title abstract was completed by Mr. Sharp's company should have caused the Bank to conduct an independent title check. The court noted that without a preexisting relationship of trust and confidence, the Bank was not justified in relying on Mr. Sharp's self-produced title report. Next, the court found that the Bank was "hot" to extend the loan

8

because it would mean increased business with First Charter. The Bank's eagerness itself was a red flag, as the Bank should have recognized that its collective judgment could have been adversely affected. The court further found that the stale financial statement should have been a red flag to the Bank. In sum, the Bank's sophistication, the irregularity of the documents, and the lack of history between the parties led the court to conclude that the Bank's reliance was not justified.

According to the Bank, the following comment from the RESTATEMENT, which was cited in *Field v. Mans*, establishes that the bankruptcy court's conclusion was erroneous:

> A, seeking to sell land to B, tells B that the land is free from all incumbrances. By walking across the street to the office of the register of deeds in the courthouse, B could easily learn that there is a recorded and unsatisfied mortgage on the land. B does not do so and buys the land in reliance upon A's misrepresentation. His reliance is justifiable.

RESTATEMENT (SECOND) OF TORTS § 540 cmt. b, illus. 1 (1977); *see also Field*, 516 U.S. at 70. This general illustration is qualified by the exception that one is not justified in relying on another's mere assertions where there are obvious indications that an independent investigation may be necessary. *Field*, 516 U.S. at 71-72.

As asserted by the Bank, the present case is analogous to the illustration in the RESTATEMENT, as the title abstract prepared by

9

First Charter is the equivalent of a statement by Mr. Sharp that there were no encumbrances on the property. However, as the bankruptcy court noted, there were red flags that should have alerted the Bank to the need to investigate. Most notably, the Bank ignored the suspicious financial statement. The financial statement was nine months old by the time of closing, it was completed on a "First National Bank of Maryland" form rather than on a Colombo form, and it was not signed by Mrs. Sharp, even though she was a signatory to the loan. (*See* Pl.'s Hr'g Ex. 3). The irregularity of this financial statement alone should have caused the Bank to question Mr. Sharp's assertions.

The Bank further contends that the bankruptcy court erred in considering the Bank's sophistication. The Bank cites *In re Biondo* to demonstrate that a party's sophistication does not *per se* require it to make an investigation. *In re Biondo* is distinguishable because there, the lender had no indication that the debtor was deceiving it. *In re Biondo* stands for the proposition that a lender is not required to make an investigation merely because it is a sophisticated entity. By contrast, where, as here, a party has knowledge and experience that makes it particularly perceptive to warning signs, consideration of the party's sophistication is certainly warranted. *Provident Bank v. Merrick (In re Merrick)*, 347 B.R. 182 (Bankr.M.D.La. 2006), cited by the bankruptcy court, is instructive on this point. *In re*

10

*Merrick* involved a lender that was in the business of making mortgage loans.  The borrower asserted that she had the power, acting alone, to mortgage property left to her by her deceased husband.  During loan negotiations, the borrower gave the lender a copy of her husband's will, which explained that the borrower only had a one-half interest in the property.  The court found that the lender's reliance on the borrower's assertions was not justified because the lender could have discovered the false statement simply by reading the will.  *Id.* at 188.  Similarly, it was not justifiable for the Bank to have relied on Mr. Sharp's assertions that were coupled with the financial statement, which the Bank should have recognized as suspect.

The Bank also challenges the bankruptcy court's factual findings regarding the relationship between the Bank and First Charter.  The Bank insists that it was entitled to rely on the title abstract produced by First Charter because they had a preexisting relationship.  At the hearing below, the parties presented conflicting descriptions of the history of their relationship.  Mr. Sharp testified that First Charter had a long-standing depository relationship with the Bank.  The Bank also submitted an internal loan approval memorandum drafted by Joel Fernebok, the Bank's former chairman, which stated that the Bank "is benefiting [sic] from the operating and escrow accounts of Charter title."  (Pl.'s Hr'g Ex. 2, at 2).  The Bank argues that

the memorandum establishes that the Bank sought to further develop a preexisting relationship. By contrast, Mr. Fernebok testified in his *de bene esse* deposition that there was no preexisting relationship between the parties, but one would be established upon completion of the loan deal. The bankruptcy court did not make a specific finding regarding the history of the parties' relationship, but found that the parties did not have a preexisting relationship of trust and confidence to justify the Bank's reliance on First Charter's abstract.[3]  This finding is not clearly erroneous, as it is not plainly contradicted by the internal memorandum.  Even if the parties had a preexisting depository relationship, the nature of the relationship was not of the sort that could support the Bank's blind reliance on Mr. Sharp's assertions.  The bankruptcy court aptly contrasted this case with one from the First Circuit, in which the court held that "[c]ertainly, the representations of a long-time customer with a reputation for honesty and trustworthiness and an excellent track record of consistent loan repayments was a basis on which to justify reliance." *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 76 (1st Cir. 1998).  Here, there was no such history to provide a basis for the Bank's reliance on Mr. Sharp's representations.

---

[3] Mr. Fernebok's deposition transcript, exhibit 27 at the September 2004 hearing, has not been designated for inclusion in the record and therefore the court cannot review the propriety of the bankruptcy court's reliance on the document.

12

The Bank also contests the court's finding that its eagerness to do a deal with First Charter was a red flag. The court found that the Bank was "hot" to make the loan because it would result in future business for the bank. The court based its finding on the internal loan memorandum and Mr. Fernebok's deposition. The internal memorandum supports the finding that the Bank was interested in developing a profitable relationship with First Charter. (Pl.'s Hr'g Ex. 2, at 2). The Bank's eagerness to enter into the deal very well could have affected its judgment and thoroughness in reviewing Mr. Sharp's loan file. In light of these factors, therefore, the bankruptcy court did not err in finding that the Bank was not justified in relying upon Mr. Sharp's self-produced title abstract.

**2. Proximate Cause**

The Bank also challenges the bankruptcy court's finding that Mr. Sharp's fraudulent misrepresentation was not the proximate cause of the Bank's loss. Proximate cause is both (1) causation in fact, "loss suffered by one who justifiably relies upon the trust of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance." *In re Bowden*, 326 B.R. 62, 89 (Bankr.E.D.Va. 2005) (citing RESTATEMENT (SECOND) OF TORTS §§ 546, 584A (1976)); *see also Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803,

13

816 (B.A.P. 1st Cir. 2005); *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991). The bankruptcy court found that the "primary credit underwriting criterion was the value of Mr. Sharp's business, followed by the value of the commissions he was expecting" and the hoped-for second trust on the Bethesda property as collateral was not a substantial factor informing the Bank's decision. (Bankr. Paper 82, at 11).

The Bank contends that the bankruptcy court's finding was a misinterpretation of the internal loan memorandum. The Bank insists that the memorandum makes clear that collateralization of the loan was a substantial factor in the Bank's decision. To be sure, much of the memorandum discusses the potential value of the Bethesda and South Carolina properties, yet there is also discussion of First Charter's worth, the Sharps' worth, and Mr. Sharp's anticipated commissions. The bankruptcy court found that the Sharps' estimated worth of $3 million eclipsed the estimated equity in the homes by such a large degree that the equity was not a substantial factor. The bankruptcy court noted that the fact that the Bank did not verify the amount of equity in the homes further undermined its assertion that the second mortgage was a substantial factor in its loan decision. Although the Bank did not verify any of the valuations provided by Mr. Sharp, checking the title on the Bethesda property was a relatively simple procedure as compared to complex valuation models for businesses. Certainly, if

14

the proposed collateral was a substantial factor, the Bank would have done its own title check. In light of these facts, it was not clear error for the bankruptcy court to conclude that the Bank did not prove by a preponderance of the evidence that the second mortgage was a substantial factor in its decision.

### B. Nondischargeability for false financial statements: 11 U.S.C. § 523(a)(2)(B)

The Bank contends that the $500,000 loan should not be discharged because Mr. Sharp used a false financial statement to procure the loan. Title 11 U.S.C. § 523(a)(2)(B) provides relief for creditors who extend loans on the basis of written financial statements that are later determined to be fraudulent:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
> . . .
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> > . . .
> > (B) use of a statement in writing–
> > > (i) that is materially false;
> > >
> > > (ii) respecting the debtor's or an insider's financial condition;
> > >
> > > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > >
> > > (iv) that the debtor caused to be made or published with intent to deceive[.]

The bankruptcy court found that Mr. Sharp intended to deceive the bank by deliberately submitting a stale financial statement that

did not disclose the existence of the Signet loan. The court concluded that discharge was appropriate nevertheless because the omission of the Signet mortgage was not material to the Bank's decision to extend the loan and the Bank did not reasonably rely on the statement. The Bank seeks reversal of the court's materiality finding and its determination that the Bank's reliance on the statement was not reasonable.

### 1. Materiality

To be materially false under 11 U.S.C. § 523 (a)(2)(B), "a false statement must be objectively material, meaning that it must misrepresent information of the type that normally affects the particular type of decision at issue." LAWRENCE P. KING, 4 COLLIER ON BANKRUPTCY ¶ 523.08[2][b] (15th ed. 1996); *see also Guar. Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 373 (Bankr.D.Md. 2005) (noting that "[a] written statement is materially false if it paints a substantially untruthful picture of the defendant's financial condition"); *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) ("A recurring guidepost used by courts [for determining material falsity] has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition.") (citing cases). The bankruptcy court concluded that the Bank failed to establish the materiality of the undisclosed $75,000 Signet mortgage, as the lending decision seemed to be based primarily on the Bank's interest in developing its relationship

16

with First Charter and the Sharps' alleged wealth. The parties disagree as to whether the materiality element is a question of law or fact. The Bank insists that materiality is an objective inquiry and therefore it is a question of law reviewed *de novo*. The Bank's argument is consistent with Third Circuit law. *See Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1115 (3$^d$ Cir. 1995) (cited by 4 COLLIER ON BANKRUPTCY ¶ 523.08[2][b]). Mr. Sharp maintains that materiality is a question of fact. The Ninth Circuit has held in some circumstances that materiality under § 523(a)(2)(B) is a fact question. *See La Trattoria, Inc. v. Lansford (In re Lansford)*, 822 F.2d 902, 904 (9th Cir. 1987). While the Fourth Circuit has not addressed this issue, it appears as though materiality is a mixed question of law and fact, as the court is being asked to apply a legal standard to a particular set of factual circumstances. *Cf. Tighe v. Ilda Valencia (In re Guadarrama)*, 284 B.R. 463, 468 (C.D.Cal. 2002)(addressing materiality in the context of revocation of discharge under 11 U.S.C. § 727(d)(1)) (citing *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

The omission of the Signet mortgage was not a material falsity. Although a third mortgage would have diminished the value of the collateral and depleted the available sources for repayment, under the circumstances of this case, the relatively small Signet loan was not likely to have influenced the Bank's decision. The burden was on the Bank to establish by a preponderance of the

17

evidence that the existence of a $75,000 second mortgage would have influenced its decision to lend the Sharps $500,000. The evidence presented indicated the contrary. As the bankruptcy court found, the relevant underwriting criteria were the value of First Charter, followed by Mr. Sharp's anticipated commissions, and the hoped-for second mortgage was only a third consideration. The Bank failed to establish that the $75,000 Signet loan, which was between the $750,000 first loan and the $500,000 Bank loan, would have influenced its decision to extend the loan to the Sharps. The Bank's assertion that it was not in the practice of making third priority mortgages does little to counteract the other evidence that it was mainly concerned with the Sharps' overall wealth. Such an incremental increase in the Sharps' liabilities did not paint a "substantially untruthful picture" of their financial condition. Accordingly, the court will affirm the bankruptcy court's conclusion that the financial statement was not materially false.

2.  **Reasonable Reliance**

The bankruptcy court did not err in concluding that the Bank did not reasonably rely on the false financial statement. Whether reliance was reasonable is a question of fact. *See Matter of Broyles*, 55 F.3d at 983. The reasonableness determination is objective and is made upon examination of the totality of the circumstances. *See In re Koep*, 334 B.R. at 373.

> [T]he reasonableness of a creditor's reliance on a financial statement should be judged by

18

> comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended.

*Telco Leasing, Inc. v. Patch (In re Patch)*, 24 B.R. 563, 567 (D.Md. 1982); *see also In re Cohn*, 54 F.3d at 1117 (noting that relevant circumstances include signals "that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate . . . [or] previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.").

The bankruptcy court concluded that the Bank's reliance on Mr. Sharp's stale financial statement was not reasonable. As discussed above, the financial statement was a notably irregular document. It was stale, not signed by both potential borrowers, and not completed on a Colombo Bank form. Further, it was not reasonable for the Bank to ignore these irregularities by merely relying on the title report prepared by First Charter. The court explained, "[t]he primary purpose of a title report is to *verify* the borrower's representations as to the state of title. In the Court's view, a lender relies on a title report supplied by the borrower at its peril." (Bankr. Paper 61, at 8, ¶ 10). The Bank insists that this finding was erroneous because First Charter's title work was insured by an independent company, American Pioneer.

19

The Bank argues that American Pioneer's reliance on the First Charter title was reason enough for the Bank to have relied on it. This argument is unpersuasive, as there is no evidence of the practices or reputability of American Pioneer, and thus no basis for the court to conclude that American Pioneer's use of the abstract could justify the Bank's reliance. In sum, the Bank's reliance on the financial statement was not reasonable, as the Bank ignored the irregularity of the document and failed to conduct a very basic investigation into the status of the title. Therefore, the bankruptcy court properly denied the Bank's objection under § 523(a)(2)(B).

## IV. Conclusion

For the foregoing reasons, the court shall affirm the judgment of the bankruptcy court. A separate Order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge